1
2
3
4
5                    UNITED STATES DISTRICT COURT
6                  NORTHERN DISTRICT OF CALIFORNIA
7
8    LARRY PAGE,                              No. C 04-1009 SI (pr)
9              Petitioner,                    **ORDER DENYING HABEAS**
                                              **PETITION**
10        v.
11   DAVID L. RUNNELS, warden,
12             Respondent.
                                    /
13   _____
14                          **INTRODUCTION**
15        This matter is now before the court for consideration of the merits of Larry Page's pro se
16   petition for writ of habeas corpus.  For the reasons discussed below, the petition will be denied.
17
18                          **BACKGROUND**
19        Larry Page and Jeffrey Gomez were charged in a 29-count indictment and both were
20   convicted of numerous crimes, although Page was convicted of fewer crimes than Gomez.  Two
21   criminal episodes provide the backdrop for Page's federal habeas petition.  The evidence of these
22   two criminal episodes was described in the California Court of Appeal's opinion.
23   <u>Counts 2, 3 and 5 Involving Michelle Amaro</u>
24        Michelle Amaro purchased a car for $2,500 from [Jeff] Gomez' sister-in-law.
     After paying between $600 and $1,100 for the car, she made no further payments.
25   Claiming that Amaro still owed money for the car, Gomez demanded $1,400.  Although
     Amaro gave Gomez another car to settle the debt, that car's engine subsequently blew up.
26   Gomez then demanded that Amaro pay him $2,500.  When Amaro said that she would
     not pay, Gomez told her he would "blow [her] fuckin' head off."  Gomez threatened
27   Amaro over the telephone, saying that he would hurt her and her children if she did not
     pay the debt.  In late 1995, Gomez told Amaro that he had assigned the debt to Page, also
28   known as Hogjaws.  Gomez, Page and a third person came to Amaro's house and told her

United States District Court

For the Northern District of California

that if she did not pay, they would take her Chevy Blazer. Around that same time, Gomez and several others visited Amaro's house one night. Gomez came at Amaro and kicked her between the legs with the metal tipped cowboy boots he was wearing. Sam Grijalva, who lived in the same house as Amaro, testified that Gomez and Page came to the house and said they were going to take the Blazer as payment for the debt. Page was holding a crowbar. Using the crowbar, Page attempted to get into the car.

In January 1996, with the knowledge of the San Jose Police Department, Amaro met with Gomez. When Amaro disputed the debt, Gomez threatened her and had his associate show her the butt of a concealed shotgun.

After Gomez and Page were arrested, Page said that he had gone to Amaro's house and tried to break into her car.

\* \* \*

<u>Counts 14, 15, 16, 17 and 18 Involving Franz Bachmeier/Rhonda Darby</u>

Franz Bachmeier rented a room in a house in Campbell. His girlfriend Rhonda Darby frequently stayed at the house. On December 10, 1995, Rhonda discovered Gomez, Page, and another associate in the house. Gomez lunged at Franz, and hit him, telling him that this was "all about respect." Page also lunged at Franz.

About a week later, Gomez, Page and their associate burst into Franz's room. Page lunged at Franz and hit him in the head with an axe. Page and Gomez pushed Franz onto a bed and began beating him. Page used a fire extinguisher to hit Franz in the head. Franz hit Gomez with a child's bat and gored Page's eye. When Rhonda screamed, Page grabbed her purse, told her to shut up and said he "was going to fuckin' kill [her]" if she told anybody what happened. Before leaving, Gomez took Franz's pager and items from Rhonda's purse. Franz was bleeding profusely from the head, and suffered extensive injuries. After being arrested, Page told police that his eye was poked during a fight in which he beat up Franz Bachmeier.

Cal. Ct. App. Opinion, pp. 3-5.

At a jury trial in Santa Clara County Superior Court, Page was convicted of attempted vehicle theft (based on the Michelle Amaro episode), as well as burglary, assault with a deadly weapon by force likely to produce death or great bodily injury, and attempted robbery of an inhabited dwelling (based on the Franz Bachmeier episode). He also was convicted of conspiracy to commit the crimes of making terrorist threats, assault, and extortion,   <u>See</u> CT 3911-3920. Page was found to have suffered two prior violent and/or serious felony convictions. He was sentenced to a term of six years plus 100 years to life in prison.

On appeal, the California Court of Appeal affirmed the judgment of conviction, but modified Page's sentence. The California Supreme Court denied Page's petition for review.

1  Page then filed this action.  His amended petition alleged five claims of constitutional

2  error in his state court proceedings:  (1) the trial court's refusal to instruct the jury on the claim-

3  of-right defense violated Page's right to due process, (2) the denial of a discovery motion to

4  obtain a police officer's personnel records violated Page's right to due process and his Sixth

5  Amendment right to confront witnesses, (3) the exclusion of relevant exculpatory evidence

6  violated Page's rights to present a defense and due process, (4) the trial court's refusal to instruct

7  on the unreliability of drug addicts' testimony violated Page's rights to due process and a fair

8  trial, and (5) Page's counsel provided ineffective assistance of counsel by refusing to allow him

9  to testify in his own defense.  Respondent filed an answer and Page filed a traverse.  The matter

10  is submitted and is now ready for consideration on the merits.

11

12  **JURISDICTION AND VENUE**

13  This court has subject matter jurisdiction over this habeas action for relief under 28

14  U.S.C. § 2254.  28 U.S.C. § 1331.  This action is in the proper venue because the challenged

15  conviction occurred in Santa Clara County, California, within this judicial district.  28 U.S.C.

16  §§ 84, 2241(d).

17

18  **EXHAUSTION**

19  Prisoners in state custody who wish to challenge collaterally in federal habeas

20  proceedings either the fact or length of their confinement are required first to exhaust state

21  judicial remedies, either on direct appeal or through collateral proceedings, by presenting the

22  highest state court available with a fair opportunity to rule on the merits of each and every claim

23  they seek to raise in federal court.  See 28 U.S.C. § 2254(b), (c).  The parties do not dispute that

24  the state judicial remedies were exhausted for the five claims in the amended petition.

25

26  **STANDARD OF REVIEW**

27  This court may entertain a petition for writ of habeas corpus "in behalf of a person in

28  custody pursuant to the judgment of a State court only on the ground that he is in custody in

United States District Court
For the Northern District of California

3

violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams (Terry) v. Taylor, 529 U.S. 362, 412-13 (2000).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decision but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. "[A] federal habeas court may nor issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Id. at 409.

## DISCUSSION

A.    Refusal To Instruct On Claim-Of-Right Defense

1.    Background

Page claims that the trial court violated his right to due process when it refused to instruct the jury on a claim-of-right defense.[1]  Page requested these instructions based on a theory that

---

[1]The requested instructions were CALJIC 4.35 and two other specially-drafted instructions.

United States District Court

For the Northern District of California

1   he was not guilty of attempted vehicle theft if he had a good faith belief that he had a right to

2   take possession of Michelle Amaro's Chevy Blazer.  The trial court rejected the request, finding

3   that the evidence presented at trial was insufficient to warrant the instruction.

4          The Court of Appeal also found insufficient evidence to warrant the instruction and

5   rejected the claim of instructional error.  The court explained that the trial court must give an

6   instruction on a defense supported by substantial evidence if the defendant relies on that defense

7   or if the instruction is not inconsistent with the defendant's theory of the case.   Cal. Ct. App.

8   Opinion, pp. 22-23.  The instruction was not warranted under the evidence presented here.  <u>Id.</u>

9   For a specific intent crime like theft, the defendant's "belief in the mistaken facts, such as a right

10  to the property taken or the owner's consent, need not be reasonable. . . .  As long as a person

11  acts in the genuine belief that certain facts exist, which if true would make the act lawful, then

12  the person has not acted unlawfully."  <u>Id.</u> at 23.  The court then focused on Page's claim-of-right

13  theory:

14          As pertinent here, the prosecutor had to show beyond a reasonable doubt that Page
            attempted to take Amaro's vehicle without her consent and with the specific intent to
15          deprive her either permanently or temporarily of her title to, or possession of, the vehicle.
            (Veh. Code, § 10851.) The requisite felonious intent existed only if Page intended to take
16          Amaro's property <u>without believing in good faith</u> that he had a right or claim to it.
            (<u>People v. Tufunga</u> (1999) 21 Cal. 4th 935, 943.)

17

18          When we compare the requirements described above with the evidence presented,
            we are convinced that the instruction was not warranted.  Even if Page did believe he was
19          entitled to the truck, there is no evidence to support a finding that such belief would be
            in good faith.  The fact that Amaro owed Gomez money and Gomez owed Page money
20          could not mean Page was somehow entitled to take Amaro's truck.   That Gomez

21          CALJIC No. 4.35 provides: "An act committed or an omission made in ignorance or by
22  reason of mistake of fact which disproves any criminal intent is not a crime.  [¶]  Thus a person
    is not guilty of a crime if [he] commits an act or omits to act under an actual [and reasonable]
23  belief in the existence of certain facts and circumstances which, if true, would make the act or
    omission lawful."  Cal. Ct. App. Opinion, p. 22 n.5.

24          Page also requested that the jury be instructed:  "If one takes personal property with a
25  good faith belief that he has a legal right to take property he is not guilty of theft.  This is the
    case even if such good faith belief is unreasonable.   The prosecution must prove beyond a
26  reasonable doubt that the defendants did not have a good faith belief for you to convict the
    defendants of theft."  Cal. Ct. App. Opinion, p. 22 n.5.  Page also requested that the jury be
27  instructed: "It is a defense to the crime of theft that a person acted under the subjective belief,
    even if such belief was mistaken, that he had a lawful claim to the property which was taken."
28  <u>Id.</u>

transferred Amaro's debt to Page is not enough.  That Gomez told Page he could take the truck is not enough.  Amaro testified that she never told Page that he could have the money or the truck.  She said that "There was no way that I'd give anybody that truck after I've already given him a car."  The evidence that Page used a crowbar to access the vehicle also undercuts any claim of good faith.  The evidence of defendants' threats likewise contradicts a good faith belief.  In sum, there was no evidence to suggest good faith by Page.  Consequently the trial court was not required to give the requested instructions.

Cal. Ct. App. Opinion, pp. 23-24.

2.      Federal Law On Instructional Error On Defense Theory

Federal habeas relief is available when an erroneous jury instruction so infects the entire trial that the resulting conviction violates due process.  See Estelle v. McGuire, 502 U.S. 62, 72 (1991).  A defendant generally is entitled to have the jury instructed on his defense theory, but whether a constitutional violation has occurred in the failure to do so will depend on the evidence in the case and the overall instructions given to the jury.  See Duckett v. Godinez, 67 F.3d 734, 745 (9th Cir. 1995), cert. denied, 517 U.S. 1158 (1996).  There must be some evidence to support the instruction in order for there to be a duty to instruct.  Id. at 743; cf. Conde v. Henry, 198 F.3d 734, 739 (9th Cir. 2000) (failure to instruct on simple kidnapping was error where defendant wanted to present a defense that he kidnapped but not for the purposes of robbing the victim); Solis v. Garcia, 219 F.3d 922, 929-30 (9th Cir. 2000), cert. denied, 534 U.S. 839 (2001) (no duty to instruct on voluntary manslaughter as lesser included offense to murder because evidence presented at trial precluded a heat of passion or imperfect self-defense instruction; no duty to instruct on involuntary manslaughter because evidence presented at trial implied malice).  To determine whether due process was violated here, one must consider the claim-of-right defense as it existed under California law because state law defines the scope of the defense.

/  /  /

/  /  /

/  /  /

United States District Court

For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### 3.   No Instruction Was Required On The Evidence Presented

"The claim-of-right defense provides that a defendant's good faith belief, even if mistakenly held, that he has a right or claim to property he takes from another negates the felonious intent necessary for conviction of theft or robbery." People v. Tufunga, 21 Cal. 4th 935, 938 (Cal. 1999).[2] The underlying rationale is that one cannot steal one's own property. The claim-of-right defense can negate the intent to steal element of robbery (or larceny) when the

---

[2]Tufunga now limits the defense to a claim to the same specific property that the defendant thinks he owns. For example, in Tufunga, the defendant testified that he took the exact same $200 in cash that he allegedly brought to the victim's home (and not some other thing or some other currency amounting to $200), and that supported giving of the claim-of-right instruction in his case.  The Tufunga court overruled an earlier case, People v. Butler, 65 Cal. 2d 569 (1967) to the extent that Butler extended the defense to "robberies perpetrated to satisfy, settle or otherwise collect on a debt, liquidated or unliquidated." Tufunga, 21 Cal. 4th at 955.

If Tufunga applied to Page's case, his claim would be patently frivolous because there was absolutely no evidence that he had given the Blazer to Amaro and tried to take it back.  Tufunga would bar the defense for him because he was not attempting to repossess the same specific property he had delivered to Amaro.

The part of Tufunga that overruled Butler was later determined not to be retroactively applicable because it would cause an unforeseeable expansion of criminal liability.  See People v. Sakarias, 22 Cal. 4th 596, 622 (Cal. 2000).  The due process concern of an unexpected judicial expansion of criminal liability does not exist here because case law on the books at the time of Page's acts had determined that the Butler rule did not apply to unliquidated claims that were subject to dispute.   The state of the law described in the text of this Order and used in the analysis is that which existed in 1996 when Page took the Blazer, to avoid the retroactivity concern identified by Sakarias.  Holmes, infra, decided in 1970 that the defense was not available for an unliquidated contract claim and Poindexter, infra, decided in 1967 that the defense was not available for an unliquidated claim based on a tort.  The unavailability of the defense for unliquidated debts subject to dispute was acknowledged by the California Supreme Court even before Tufunga, in People v. Barnett, 17 Cal. 4th 1044, 1144 (Cal. 1998) ("the availability of the defense has been questioned if the claim at issue is unliquidated and therefore subject to dispute"); see also id. at 1146 ("unlike the situation in Butler, supra, 65 Cal. 2d 569, where there was evidence that the victim had acknowledged the debt, the debt claimed here was, by all accounts, uncertain and open to dispute");  id. ("From this testimony it is clear that defendant's claim of right amounted to no more than a rough estimate of a disputed debt.  As such, it bore no resemblance to the claim at issue in Butler.")

Even in the hypothetical world where a person ponders criminal liability exposure before committing a crime, any person contemplating taking the Blazer would have found California case law from the appellate courts that already had limited Butler and determined that the claim of right defense did not apply to debts in dispute.  One did not need Tufunga to determine that.  Had Page looked to see whether he could be criminally liable for taking property to settle an unliquidated debt, he would have  found that he could.  There is not a retroactivity concern here.

defendant acts "under the subjective belief that he or she has a <u>lawful</u> claim on property." <u>See</u> <u>People v. Romo</u>, 220 Cal. App. 3d 514, 518 (Cal. Ct. App. 1990) (emphasis added).  The defense does not and did not apply to unliquidated debts, i.e., debts as to which the amount owed was in dispute, whether the source of the alleged obligation was in tort or contract.  <u>See</u> <u>People v.</u> <u>Holmes</u>, 5 Cal. App. 3d 21, 24 (Cal. Ct. App. 1970); <u>People v. Poindexter</u>, 255 Cal. App. 2d 566, 570 (Cal. Ct. App. 1967).  In <u>Poindexter</u>, the court refused to allow a claim-of-right defense for a defendant who took money out of a cash register in a bar to pay for his doctor bill for injuries he had just suffered in a bar fight.  "Clearly, it is one thing to entertain a bona fide belief that the victim of a taking owes a sum certain to the taker, and quite another to help oneself to money in satisfaction of an unliquidated questionable tort claim." <u>Id.</u>  In <u>Holmes</u>, the court applied the <u>Poindexter</u> principle to a contract-based debt and refused to find a claim of right defense for a defendant who took items from someone who had hired him to clean out a garage – a taking allegedly prompted by defendant's belief that the "victim owed him a debt which he never intended to pay and defendant was therefore entitled to take his property to offset this debt." <u>Holmes</u>, 5 Cal. App. 3d at 24.

There are two problem areas for Page's argument that a claim-of-right instruction should have been given: (1) the absence of any evidence that the debt was liquidated and for a sum certain and (2) the absence of evidence that he believed he had a lawful right to take the Blazer.

The evidence was that the existence and amount of the debt were hotly disputed.  Page has not pointed to any evidence that the debt Amaro allegedly owed was liquidated or certain in amount.  Amaro testified that the debt had been satisfied ("squashed," in her words) when she signed over her Pontiac to Gomez in satisfaction of the debt for the 280Z she earlier bought.  RT 1995, 2046.  Gomez unilaterally revived the debt or created a new one when the Pontiac's engine blew out just a few weeks after Amaro signed it over to satisfy the debt. RT 1996.  There is no evidence that Amaro voluntarily agreed to a revival of the debt or to the creation of a new one. She told Gomez she wasn't going to pay him and Gomez said he'd "blow my fuckin' head off" and Gomez's assistant, Martin Lopez, revealed that he was carrying a shotgun.  RT 1996-1997.  Even assuming that there was sufficient evidence that a debt existed, the amount of that debt

United States District Court

For the Northern District of California

was hotly disputed -- depending on what testimony one wanted to believe, Amaro had paid somewhere between $100 and $1600 cash plus the Pontiac -- and there was no evidence of any particular amount that Amaro owed on the day Page tried to take the Blazer.  Gomez thus had at best an unliquidated claim against Amaro.  The claim-of-right defense did not apply to the disputed debt under California law.  See Barnett, 17 Cal. 4th at 1144; Holmes, 5 Cal. App. 3d at 24; Poindexter, 255 Cal. App. 2d at 570.

Second, there was not enough evidence that Page believed he had a lawful right to take the Blazer so as to require that the instruction be given.  Page distorts the meaning of Amaro's testimony in suggesting Amaro felt a contractual obligation to pay Page.  When taken in context, Amaro's testimony was that fear rather than a contractual duty made her feel she had to pay Page.  Turning over the Pontiac "squashed" the debt to Gomez in Amaro's mind and the revival of the debt was unilateral by Gomez and done with a shotgun looming in the background.  The transfer of the alleged debt to Page was presented to her as a fait accompli and she was informed that failing to pay that debt would be detrimental to her health.  Gomez told Amaro that, since she owed Gomez and Gomez owed Page money, "the debt was now resumed over to Larry" Page.  RT 2001.  At the meeting where Amaro was informed of the transfer of the debt, Gomez, Page and Martin were all present and she was told by Gomez that she would be hurt if she didn't pay.  RT 2003.  She felt she should pay Page because of what she had known of his reputation from the past.    RT 2002, see also RT 2087-2088; cf. RT 2441 and 2448 (with regard to a different debtor, Page admitted to a police officer that he sometimes was brought along because he intimidated people based on his violent reputation).   Amaro was not, however, personally afraid of Page and he never personally threatened her.  RT 2077, 2097-2098.  She tried to reconcile the statements by saying that Page had never harmed her but had a reputation.  The debt collection activities sometimes involved implicit or explicit threats and sometimes were done while Gomez was accompanied by Martin who revealed that he was carrying a shotgun. See, e.g., RT 1997, 2011, 2090.  Amaro did not offer the Blazer in exchange for the alleged debt; rather, Gomez told her it was going to be taken if she did not pay.  RT 2004.

United States District Court

For the Northern District of California

1  Page also has not pointed to evidence of the amount of the debt Gomez allegedly owed

2  to Page that purportedly gave him the right to take property to collect on that debt.  The evidence

3  does not show whether Gomez owed him, for example, ten dollars or a million dollars.  The

4  absence of this evidence goes to the bona fides of his claimed right to take the Blazer.  The

5  absence of the evidence also impairs a determination that the Gomez-Page debt was for a fixed

6  amount.

7  In sum, there was no evidence that Page believed that he had a <u>lawful</u> claim on the Blazer.

8  Whether it is expressed as a "good faith belief in a right" or as an "actual belief in a lawful right,"

9  the defense is based on the idea that the defendant thought the law allowed his conduct and the

10  word "right" implies authorization by law.  <u>See, e.g.</u>, <u>Butler</u>, 65 Cal. 2d at 573 ("bona fide belief,

11  even though mistakenly held, that one has a right or claim to the property");  <u>Poindexter</u>, 255

12  Cal. App.2d at 569 ("good faith, though erroneous, belief that he had a right or claim to the

13  property taken"); <u>Romo</u>, 220 Cal. App. 3d at 519 (citing <u>Butler</u> and referring to the standard as

14  a "subjective belief he or she had a lawful claim on the property").  Even Page's proposed jury

15  instruction mentioned the need for the defendant to have a good faith belief in a "legal right to

16  take property."  <u>See</u> footnote 1, <u>supra</u>.  Although the California Court of Appeal did not

17  specifically articulate this point, it is doubtless implicit in its analysis as it rejected the argument

18  that Page's alleged belief in his right was in good faith.  <u>See</u> Cal. Ct. App. Opinion, p. 24.  Page's

19  statements that he had a right to take the Blazer were not enough to allow the inference he

20  believed he had a <u>lawful</u> right.  There is a difference between, "Because you owe me money, I'm

21  going to take something from you to make up for it" and "Because you owe me money, the law

22  allows me to take something of yours to make up for it."  Only the latter point would provide a

23  good faith claim-of-right defense.  Furthermore, the insubstantiality of the evidence is even more

24  noteworthy when one views the statements in the context that the debtor was being intimidated

25  and threatened with physical harm.

26  Page's separate argument that he thought Amaro had given him permission to take the

27  Blazer had almost no evidentiary support.  The minuscule amount of evidence on the point

28  consisted of Amaro's testimony that, when she said she was going to try to get the money from

1    her mother to pay Page, it was possible that Page may have misunderstood that he could have

2    the money or the vehicle.  RT 2083.[3]  No testimony was elicited regarding the basis for Amaro's

3    speculation.   By contrast, Amaro provided lots of testimony that she did <u>not</u> give anyone

4    permission to take the Blazer.  She had not signed her Blazer over to anyone and no one had her

5    permission to take the Blazer.  RT 2015, 2082.  There was no testimony that Page told the

6    homeowner that Amaro had given him permission to take the Blazer when he showed up to take

7    it.  Rather, he just said "that was his car, that Jeff [Gomez] owed him some money, and Jeff was

8    going to give him that car so he could take it."  RT 1632.  Page told the homeowner that Gomez,

9    not Amaro, consented to him taking the Blazer.  RT 1654, 1664.  The paltry amount of evidence

10   supporting any claim that Page mistakenly thought he had Amaro's permission to take the Blazer

11   did not require a mistake of fact or claim-of-right instruction.   There was no due process

12   violation and no harmless error in failing to give the instruction based on a theory that Amaro

13   gave Page permission to take the Blazer.

14          The California Court of Appeal's rejection of Page's due process claim was not contrary

15   to or an unreasonable application of clearly established federal law.  Like the state appellate

16   court, this court does not believe that Page was entitled to a claim-of-right instruction under state

17   law based on the evidence presented at his trial.  Due process was not violated by the failure to

18   provide an instruction to which the defendant was not entitled on the evidence.

19

20   B.     <u>Denial of Motion to Discover Police Officer Personnel Records</u>

21          Page claims that the trial court's denial of his <u>Pitchess</u> motion violated his constitutional

22   rights to confront witnesses and to due process.[4]  During the trial, Gomez filed (and Page joined)

23

24          [3]The totality of the evidence on the point consisted of this exchange:  "[Question by Mr.
     Tursi]:  And at that point in time, is it possible that the misunderstanding took place where Larry
25   thought that he would have the money or the car?  [Answer by Ms. Amaro]:  Possibly, yeah."
     RT 2083.
26

27          [4]California's <u>Pitchess</u> procedure, named for <u>Pitchess v. Superior Court</u>, 11 Cal. 3d 531
     (1974), has to do with a criminal defendant's right to discovery of peace officer personnel
28   records, specifically of complaints made against the officer.  The procedure has been codified.
     <u>See</u> Cal. Penal Code §§ 832.7, 832.8; Cal. Evid. Code §§ 1043-1045.  The <u>Pitchess</u> procedure

a motion to discover the personnel records of San Jose Police Officer Paul Ayoob, who had arrested Susan Tucker and Mark Thompson on charges of forgery and possession of methamphetamine.  The motion sought to discover any prior complaints or discipline against officer Ayoob, including information that he had fabricated evidence or charges and had used threats or coercion.  In his declaration supporting the motion, co-defendant's counsel stated that Tucker had testified that officer Ayoob had engaged in misconduct during her arrest, i.e., officer Ayoob had "suggested several things to her regarding Jeffrey Kevin Gomez and, further, that she should plant a gun on Mr. Gomez." CT 3561.  Counsel further declared that the defense would show that when officer Ayoob released Tucker the day he arrested her, "she agreed to keep in touch with Officer Ayoob and provide him with information concerning Jeffrey Kevin Gomez. Lastly, the defense will show that Officer Ayoob offered lenient treatment to witness Tucker, falsified his report relative to Susan Tucker, and conducted himself in a corrupt and patently illegal manner" on the day of her arrest. CT 3561.  At the <u>Pitchess</u> hearing, counsel also argued that Mark Thompson had testified that officer Ayoob suggested to him that he plant a gun or drugs on Gomez and that Thompson's testimony indicated Ayoob had falsified a police report. RT 3522.  The trial court took into account the testimony of Tucker and Thompson in which the statements were made as well as the materials supporting the <u>Pitchess</u> motion, and found that good cause had not been shown for the production of officer Ayoob's personnel records.

The California Court of Appeal held that the trial court did not abuse its discretion in denying the <u>Pitchess</u> motion because the defendants had not established the good cause necessary for the documents to be produced for <u>in camera</u> review, much less to be produced to the defense.  The declaration offered in support of the motion "does not adequately link the

---

follows two steps.  First, the defendant must make a written motion for peace officer personnel records that describes the records sought and that is "supported by 'affidavits showing good cause for the discovery or disclosure sought, setting forth the materiality thereof to the subject matter involved in the pending litigation and stating upon reasonable belief that such governmental agency identified has the records or information from the records.'" Cal. Ct. App. Opinion, p. 20 (quoting <u>California Highway Patrol v. Superior Court</u>, 84 Cal. App. 4th 1010, 1019-20 (Cal. Ct. App. 2000).  Second, if a showing of good cause is made, the trial court will conduct an <u>in camera</u> review of the records to determine whether they are relevant to the current proceedings.  <u>Id.</u>

alleged misconduct with the subject matter of the litigation." Cal. Ct. App. Opinion, p. 21.  The gun-planting allegation did not provide good cause because there was "no allegation that any gun was in fact planted on Gomez or anyone or that any evidence at all was fabricated." Id.  And officer Ayoob had no role in the arrest of either Gomez or Page.  The court further explained that there was no showing that Tucker's alleged agreement to keep in touch with officer Ayoob was improper, or that the allegedly lenient treatment offered to Tucker was connected to the case against Gomez and Page.  Finally, the declaration did not explain "how an allegedly false police report by Officer Ayoob concerning Tucker impacted Gomez or Page or why it was material to their case."  Cal. Ct. App. Opinion, p. 22.

In Brady v. Maryland, 373 U.S. 83 (1963), the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Id. at 87.  Under Brady, as modified by Pennsylvania v. Ritchie, 480 U.S. 39, 58 & n.15 (1987), the petitioner must first make a preliminary showing that the file contains undisclosed material evidence if he wants judicial review of the records to determine if any should be disclosed.  Harrison v. Lockyer, 316 F.3d 1063, 1066 (9th Cir.), cert. denied, 538 U.S. 988 (2003).  The Harrison court commented: "We are not instructed on how a defendant in a criminal case will know, or be able to make, a preliminary showing that a police personnel file contains evidence material to his defense.  But we are clear that the California Supreme Court has faithfully followed the United States Supreme Court [in requiring such a showing]." Id.

Page did not make that preliminary showing of materiality in trial court, and has not made it here.  Because the trial court never proceeded to the second step of the Pitchess procedure, i.e., in camera review of the records, neither the state courts nor this court know what, if anything, was in Ayoob's personnel file that was responsive to the discovery request.  As was the case in Harrison, the absence of any evidence that there was any exculpatory evidence to be found is fatal to petitioner's due process claim.  The state appellate court's rejection of this claim was not contrary to, nor an unreasonable application of, clearly established Supreme Court authority.

1    See Harrison, 316 F.3d at 1066.

2         The state appellate court reasonably determined that Gomez and Page did not show a

3    nexus between any prior complaints or discipline against Ayoob and their arrest and prosecution,

4    because no gun or drugs were actually planted on Gomez or Page, and Ayoob did not participate

5    in the arrest of either Gomez or Page.   There also was no showing that the allegedly unaccepted

6    offer of lenient treatment of Tucker was in exchange for something to be done in Page and

7    Gomez's case.   And there was no showing that the allegedly false report about Tucker's arrest

8    had any bearing on Page and Gomez's case.   In short, the alleged misdeeds of officer Ayoob as

9    reported by Tucker and Thompson were not shown to be material or to provide a plausible

10   factual foundation for any allegation of officer misconduct committed in connection with Page

11   and Gomez.   See Cal. Ct. App. Opinion, pp. 21-22.

12        Furthermore, there was no indication that Ayoob had made any statement to Tucker or

13   Thompson about Page in particular, so his speculation as to what might be in the file that might

14   have helped him is particularly unfounded.   In his traverse, Page urges that he could have used

15   the Pitchess evidence to show that Ayoob similarly coerced Bachmeier into fabricating evidence.

16   However, there was no evidence presented to this effect in state court and Page did not cross-

17   examine Bachmeier on this theory.   For these reasons, the trial court's decision to deny the

18   discovery motion was not arbitrary and did not result in a fundamentally unfair trial for Page.

19        Page also argued that the failure to grant the discovery motion violated his Sixth

20   Amendment right of confrontation.   The Supreme Court has explained that the denial of

21   discovery requests should be reviewed under the Due Process Clause rather than the

22   Confrontation Clause.   See Pennsylvania v. Ritchie, 480 U.S. at 51-56.

23

24   C.    Exclusion Of Evidence Of Bachmeier's Violent Nature

25        Page claims that the exclusion of evidence of Bachmeier's violent acts and reputation for

26   violence violated his constitutional right to present a defense.   The defendants wanted to present

27   evidence that Bachmeier had committed violent acts, including violence against Rhonda Darby

28   (the woman who was with him when Page hit him) and that Bachmeier had a reputation for

14

violence. This allegedly would have been in support of Page's defense of self-defense, i.e., that he only hit Bachmeier after Bachmeier hit him. The trial court excluded the evidence at first because there was no evidence in the record of self-defense and therefore it was not relevant. See RT 1397. Later, once it appeared that the evidence was being offered under California Evidence Code § 1103 (a provision that allows character evidence of a victim's other violent behavior but opens the door to evidence of a defendant's other violent behavior), the trial court excluded it under California Evidence Code § 352. See RT 3851. The trial court explained: "The court finds to permit this type of evidence to come in under 1103, when it is really evidence being used for purposes of impeachment, would basically divert the jury's attention, would consume time, and would confuse the issues, and because we would be placed in a situation where both the defense and the prosecution would have to present additional evidence concerning these eight or nine alleged conduct or circumstances to prove them up and we're not going to spend time doing that." RT 3851.

The California Court of Appeal rejected Page's challenge to the evidentiary ruling. The appellate court determined that the trial court did not abuse its discretion in excluding the evidence. "The trial court could have found the evidence regarding Bachmeier's violence irrelevant since there was no self-defense theory before the court. The court could have decided that Bachmeier's alleged violence was not a material fact in deciding whether Gomez and Page assaulted and robbed Bachmeier and Darby. The domestic abuse evidence could have been found collateral and dissimilar to the assaults by Gomez and Page." Cal. Ct. App. Opinion, p. 14. That court also rejected the constitutional claim, stating that California's evidence rules do not violate a defendant's constitutional right to present a defense. See id. at 14-15.

The U.S. Constitution gives a criminal defendant the right to present a defense. "Whether rooted directly in the Due Process Clause of the Fourteenth Amendment . . . or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, . . . the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" Crane v. Kentucky, 476 U.S. 683, 690 (1986) (citations omitted). The Compulsory Process Clause of the Sixth Amendment preserves the right of a defendant in a criminal trial to have compulsory

process for obtaining a favorable witness.

> The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law.

Washington v. Texas, 388 U.S. 14, 19 (1967). This right was held applicable to the states through the Fourteenth Amendment. See id. at 18-19. A cluster of Supreme Court cases have addressed the criminal defendant's right to present evidence in support of his defense. In Chambers v. Mississippi, 410 U.S. 284 (1973), the Court held that the defendant was denied a fair trial when the state's evidentiary rules prevented him from calling witnesses who would have testified that another witness made trustworthy, inculpatory statements on the night of the crime. And in Crane v. Kentucky, 476 U.S. at 690-91, the Court held that the defendant's right to present a defense was violated by a trial court's blanket exclusion of competent, reliable evidence bearing on the credibility of a confession when such evidence is central to the defendant's claim of innocence. See also Green v. Georgia, 442 U.S. 95 (1979) (finding a due process violation in the exclusion of highly relevant and reliable hearsay evidence on a key issue); Rock v. Arkansas, 483 U.S. 44, 56-62 (1987) (Arkansas' per se rule excluding all hypnotically enhanced testimony was unconstitutional when used to restrict defendant's right to testify). The common thread running through these cases is that "states may not impede a defendant's right to put on a defense by imposing mechanistic (Chambers) or arbitrary (Washington and Rock) rules of evidence." LaGrand v. Stewart, 133 F.3d 1253, 1266 (9th Cir.), cert. denied, 525 U.S. 971 (1998); see also Carson v. Peters, 42 F.3d 384, 387 (7th Cir. 1994) (Chambers and Green "establish[] the rule that 'if the defendant tenders vital evidence the judge cannot refuse to admit it without giving a better reason than that it is hearsay.' [Citation.] If the state judge does give a 'better reason,' then Chambers and Green have served their purpose--to relax the stranglehold of maxims and get judges to think functionally.")

The Sixth Amendment right to present relevant testimony "may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process." Chambers, 410 U.S. at

United States District Court
For the Northern District of California

295; Taylor v. Illinois, 484 U.S. 400, 410-11 (1988) (right to compulsory process is not absolute).  Thus, the accused's compulsory process right may be limited by evidentiary rules.  See Perry v. Rushen, 713 F.2d 1447, 1453-54 (9th Cir. 1983) (no violation of compulsory process to prohibit evidence of third party identity because evidence collateral and state interest in evidentiary rule overriding), cert. denied, 469 U.S. 838 (1984); cf. Montana v. Egelhoff, 518 U.S. 37, 42-43 (1996) (defendant does not have an unfettered right to offer evidence that is incompetent, privileged or otherwise inadmissible under standard rules of evidence; the exclusion of evidence does not violate the Due Process Clause unless it offends some fundamental principle of justice).  "[T]he Constitution leaves to the judges who must make these decisions 'wide latitude' to exclude evidence that is 'repetitive . . ., only marginally relevant' or poses an undue risk of 'harassment, prejudice, [or] confusion of the issues. . . .  Moreover, [the Court has] never questioned the power of States to exclude evidence through the application of evidentiary rules that themselves serve the interests of fairness and reliability--even if the defendant would prefer to see that evidence admitted."  Crane, 476 U.S. at 689-90 (citations omitted).

The exclusion of the evidence under California Evidence Code § 352 was not an unreasonable application of clearly established federal law.  Section 352 is a rather commonplace kind of evidentiary rule allowing the exclusion of evidence where its probative value is substantially outweighed by the probability that its admission will necessitate undue consumption of time, be unduly prejudicial, confuse the issues or mislead the jury.  Section 352 itself does not offend due process or the right to present a defense.  Cf. Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986).  The California Court of Appeal's determination that California's evidence rule in § 352 was not unconstitutional was correct.

The application of § 352 to exclude the evidence in this case did not result in a constitutional violation.  Both state courts considered the surrounding circumstances and reached their conclusion that any relevance was outweighed by the consumption of time and issue confusion that would occur if the evidence was admitted.  In determining that Page's right to present a defense was not violated, this court has considered the several factors that have been

**United States District Court**

For the Northern District of California

identified to determine whether the exclusion of evidence violated the right to a fair trial or to present a defense: the probative value of the excluded evidence on the central issue; the evidence's reliability; whether the evidence is capable of evaluation by the trier of fact; whether it is the sole evidence on the issue or merely cumulative; and whether the excluded evidence constitutes a major part of the attempted defense. See Chia v. Cambra, 360 F.3d 997, 1004 (9th Cir. 2004), cert. denied, 544 U.S. 919 (2005); Drayden v. White, 232 F.3d 704, 711 (9th Cir. 2000), cert. denied, 532 U.S. 984 (2001). The probative value of the excluded evidence was not particularly strong because Bachmeier's criminal activities did not prove or disprove Page's guilt and were only relevant to the believability of his statements about the sequence as to who hit who first (which pertained to whether Page hit Bachmeier in self-defense). On the evidence in the record, Bachmeier's violence apparently was only relevant to impeach his credibility in general. The evidence's reliability was questionable because Bachmeier had not suffered a conviction and apparently had not even faced criminal charges for most of the events Page wanted to explore. The evidence also would not have been capable of ready evaluation by the jury. There is no indication that Bachmeier would have conceded all the alleged episodes of violent behavior, so his violence would have to be established through other witnesses. Page presumes that Bachmeier's reputation for violence and history of particular violent acts could have been shown in a quick and direct evidentiary presentation, but the evidentiary presentation would have been far murkier and dragged-out than he thinks. Efforts to make the point likely would have resulted in a mini-trial (of Bachmeier's acts of violence) within a trial (of the guilt of Page and Gomez) that would have taken much time and would have been very confusing to the jury. The trial court was rightly concerned about the trial getting side-tracked on the collateral issue of Bachmeier's previous behavior and on the collateral issue of the impeachment of the witnesses who would testify about his alleged violence – the latter concern arising in part from the fact that so many people involved had significant histories of drug use and criminal records. The evidence was the only evidence on the point of Bachmeier's violence, but that was a collateral point. Bachmeier's criminality in general and his drug usage was explored at trial, so the jury had some idea of Bachmeier's credibility in general.

United States District Court

For the Northern District of California

Page emphasizes heavily that the trial court's error was especially bad because evidence of Bachmeier's violence was so necessary to Page's self-defense theory as set out in the testimony of Robin Abela.  There are two main problems with this argument.  First, Abela did not testify until late in the trial and the trial court's rulings before she testified did not have the benefit of that testimony.  The first few times the defense argued that evidence of Bachmeier's violence was necessary to support the self-defense theory, the trial court said there was not yet evidence of self-defense to warrant the admission of the evidence of the victim's alleged violent character under § 1103.  Page's counsel asserted that Page would be testifying to self-defense, but the trial court noted that Page always had the option to decide not to testify and therefore was not going to allow the evidence based on testimony that may or may not occur.  See RT 1397 (if Page did not testify, there would be evidence of the victim's state of mind "without any connect or nexus with the alleged state of mind of the defendant at the time that this incident occurred.")  Second, Abela's testimony did not provide the self-defense evidence necessary to make the evidence of the victim's other acts of violence relevant to it.  In her testimony, Abela recounted what Bachmeier had told her a few days after the incident when she went to see him at the hotel where he was hiding.  Abela testified that Bachmeier told her that Page hit him with a fire extinguisher when Bachmeier rushed at him with a baseball bat.  RT 4222.  However, that evidence was stricken as hearsay.  Regardless of the hearsay problem, the entirety of Abela's testimony does not show self-defense.  Abela testified that Bachmeier told her that the three men showed up at his residence because he owed Page some money and things "went sour" before the fire extinguisher/baseball bat exchange occurred.  See RT 4218.  Indeed, Abela had been told that things had soured enough that Rhonda Darby had threatened to call the police before Bachmeier allegedly rushed at Page with a baseball bat.  RT 4226.  Abela admitted she told the investigator Bachmeier told her he had been beaten up by the threesome, and admitted that she told the investigator they were there to collect on a debt.  RT 4226.  Page's self-defense theory takes Abela's testimony out of context, as does his argument that her testimony supports his version that Bachmeier "grabbed a baseball bat and started the fight, after which petitioner was forced to defend himself and hit Bachmeier with a fire extinguisher."  Memo. Of Points And

United States District Court

For the Northern District of California

Authorities In Support Of Amended Petition, p. 7.  The whole of the picture Abela painted in recounting Bachmeier's story to her was that the threesome showed up to collect a drug debt and things soured to the point where someone threatened to call the police <u>and then</u> Bachmeier rushed at Page with a baseball bat and Page hit him with a fire extinguisher.  Those facts do not provide evidence of self-defense to make relevant the collateral exploration into Bachmeier's alleged reputation for violence under § 1103.

After consideration of the factors identified in <u>Chia</u>, the court is convinced that the exclusion of evidence about Bachmeier's violence and reputation for violence did not violate Page's federal constitutional right to present a defense.  The state appellate court's rejection of the claim was not contrary to or an unreasonable application of clearly established Federal law on the constitutional right to present a defense.

Finally, even if the trial court erred in excluding the evidence, any error would have been harmless.  A federal habeas petitioner is not entitled to relief unless the trial error "'had substantial and injurious effect or influence in determining the jury's verdict."  <u>See</u> <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637 (1993) (quoting <u>Kotteakos v. United States</u>, 328 U.S. 750, 776 (1946)).  The error must have resulted in "actual prejudice."  <u>Id.</u> (citation omitted).  Any error in excluding the evidence did not result in actual prejudice at Page's trial.  The jury was not given an inaccurate picture of Bachmeier or of the incident during which Page hit him by virtue of the exclusion of the evidence of Bachmeier's violent activities.  The jury heard evidence that Bachmeier had a lengthy criminal record, was a methamphetamine and marijuana user, and had given prior inconsistent statements – thereby hearing an array of information that aided it in evaluating his credibility.  Also, Darby corroborated that Page and Gomez, rather than Bachmeier, were the aggressors.  And Page had admitted to a police officer that they beat up Bachmeier, without mentioning that he acted in self-defense.

/   /   /

/   /   /

D.      Failure To Instruct On Drug Addicts' Testimony

Page contends his right to due process was violated when the trial court refused to give a special instruction to the jury on assessing the credibility of the testimony of a person who was under the influence of drugs.  The court charged the jury with a modified CALJIC 2.20, stating in part:

> Every person who testifies under oath is a witness.  You are the sole judges of the believability of a witness and the weight to be given the testimony of each witness.  [¶] In determining the believability of a witness you may consider anything that has a tendency to prove or disprove the truthfulness of the testimony of the witness, including but not limited to any of the following: [¶] The extent of the opportunity or ability of the witness to see or hear or otherwise become aware of any matter which the witness testified; [¶] The ability of the witness to remember or to communicate any matter about which the witness testified; . . . [¶]  The existence or nonexistence of a bias, interest, or other motive . . .

Cal. Ct. App. Opinion, p. 18.  The instruction also allowed the jury to consider prior criminal conduct, and any offers of immunity or leniency.  See RT 4651-4652.  The court refused Page's requested additional specific instruction that the jury could consider whether the witness was under the influence of drugs was also a factor to take into consideration in evaluating a witness' credibility.  See RT 4548.  The California Court of Appeal ruled that even if refusal to grant the instruction was an error, there was no prejudice to Page, because the effects of drug usage on a witness' credibility go to perception and memory, which the jury was instructed on, and the verdict would not have changed had the instruction been given.  Cal. Ct. App. Opinion, p. 18. Contrary to Page's assertion, the state appellate court did not find that there was an error; rather, that court (as courts often do) found the claim easier to dispose of by addressing the lack of any prejudice from any assumed error.

A state trial court's refusal to give an instruction does not support habeas relief unless the error so infects the trial that the defendant is deprived of the fair trial guaranteed by the Fourteenth Amendment.  See Dunckhurst v. Deeds, 859 F.2d 110, 114 (9th Cir. 1988).  Whether a constitutional violation has occurred will depend upon the evidence in the case and the overall instructions given to the jury.  See Duckett v. Godinez, 67 F.3d at 745.  A criminal defendant is entitled to adequate instructions on the defense theory of the case, as long as some evidence supports it.  See Conde v. Henry, 198 F.3d at 739.  However, the defendant is not entitled to

have jury instructed in his or her precise terms where the given instructions adequately embody the defense theory.  See United States v. Del Muro, 87 F.3d 1078, 1081 (9th Cir. 1996).  If an error is found, the court also must determine that the error had a substantial and injurious effect or influence in determining the jury's verdict, see Brecht v. Abrahamson, 507 U.S. at 637, before granting relief in habeas proceedings.

Here, the failure to provide a specific instruction on evaluating testimony by drug users did not violate Page's right to due process.  None of the cases identified by Page state that the constitution requires a special instruction as to the evaluation of a drug user's testimony.  Page had no right to have the jury instructed in his precise terms because the instruction that was given adequately instructed about evaluating witness testimony.  Defense counsel was able to attack the credibility of witnesses based on their drug use in his closing argument.  Page's argument that the "jurors' hands . . . were tied," Traverse, p. 20, on the evaluation of drug-using witnesses' testimony is baseless.

The absence of a specific instruction that the jury should consider drug usage in evaluating witness credibility also was harmless in that it did not have a substantial and injurious effect on the jury's verdict.  See Brecht, 507 U.S. at 637.  Given the instructions as a whole and the entirety of evidence presented at trial, the jurors knew that Amaro, Darby, Bachmeier, and other key prosecution witnesses had histories of methamphetamine use.  The jury had heard testimony that Darby and Bachmeier were under the influence of methamphetamine at the time of the burglary and assault for which Page was convicted. The jurors then were logically able to determine what effect, if any, they determined that drug use had on the ability of Amaro, Darby and Bachmeier to perceive and remember the events to which their testimony related.  There was no constitutional violation and no prejudice in the refusal to give an additional instruction.  The state court's rejection of the claim was not contrary to or an unreasonable application of clearly established federal law.

/  /  /

/  /  /

**United States District Court**

For the Northern District of California

E.      Ineffective Assistance Of Counsel Claim

Page claims that his lawyer provided ineffective assistance of counsel by refusing to allow him to testify at trial.  Page told his attorney, Andrew Tursi, that he wanted to testify. Tursi strongly encouraged Page not to testify.  Page complained to the court in a hearing, and Tursi explained that though he had zealously advocated for Page not to testify, the decision ultimately belonged to Page.  Counsel stated "I didn't say you can't, because [Page] is smart enough to know he could have stood up if he wanted to and just walked up and testified, but I was very vehement in my opposition to his testimony and that's for sure."  Amended Petition, p. 22 (quoting RT 4932-33).  The trial court determined that Page was not prevented from testifying and the disagreements between Page and Tursi did not amount to a violation of Page's right to counsel.  Id.

The Sixth Amendment right to counsel guarantees effective assistance of counsel.  See Strickland v. Washington, 466 U.S. 668, 686 (1984).  The benchmark for judging any claim of ineffectiveness is whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result.  Id.  A habeas petitioner must establish two things to prevail on a Sixth Amendment ineffectiveness claim: (1)  that counsel's performance fell below an "objective standard of reasonableness" under prevailing professional norms, Id. at 687-688; and (2) that he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Id. at 694.  A difference of opinion as to trial tactics does not automatically amount to ineffective assistance. See Brodit v. Cambra, 350 F.3d 985, 994 (9th Cir. 2003), cert. denied, 542 U.S. 925 (2004).

The defendant does have a fundamental right to testify in his own behalf, see Rock v. Arkansas, 483 U.S. 44, 51-53 (1987), but counsel's strong urging that Page not testify did not preclude the exercise of that right.  The trial court rejected the contention that counsel had prevented Page from testifying.  Page has not presented sufficient evidence to overcome the presumption of correctness attached to the trial court's determination that counsel did not prevent him from testifying.  See 28 U.S.C. § 2254(e).  Trial counsel's advice to Page to not testify was

based on his view that the "'evidence came in as good as we could possibly hope for,'" Petition, p. 22, and was an informed decision to which substantial deference is owed. Counsel's decision to encourage Page not to testify was objectively reasonable, given the entirety of the circumstances.

Page argues that he could have presented his claim-of-right-story with regard to the crime against Amaro and could have presented his self-defense story with regard to the crime against Bachmeier, both to his substantial benefit. One cannot be certain exactly what Page's testimony would have been because he did not testify. However, it is clear that the good would have come in with the bad, and there was substantial unfavorable material that would have been introduced if Page testified. According to the probation/sentencing report, Page had attributed much of his criminality to his long-term use of methamphetamine. See CT 4059. Evidence that Page had used drugs would, of course, have hindered his ability to cast doubt on other witnesses' credibility based on their drug use and made his own credibility doubtful. Much of Page's lengthy criminal history would have been presented to the jury had he testified. Page's 15 felonies and 25 misdemeanors included convictions for assaultive behavior, weapons-related offenses and drug-related offenses. See CT 4061-4093. Because counsel's tactical decision to strongly urge his client to not testify was reasonable and he did not prohibit Page from testifying in his own behalf, the ineffective assistance of counsel claim fails.

## CONCLUSION

For the foregoing reasons, the petition for writ of habeas corpus is DENIED. The clerk shall close the file.

IT IS SO ORDERED.

DATED: October 11, 2006

_____
SUSAN ILLSTON
United States District Judge